We'll move to our second argument of the morning. That comes in Appeal No. 25-1713. BBLI Edison, LLC v. City of Chicago. Okay, Mr. Bremer, nice to see you whenever you're ready. Good morning, and may it please the Court, I am David Bremer for the appellant BBLI Edison. Your Honor, in an attempt to control the use of foreclosed rental property, the City passed an ordinance that forces owners like BBLI to transfer their property, their money, to tenants who voluntarily choose to leave the property instead of accept a new lease. The main point of contention seems to be whether this taking of BBLI's money for tenant use is analyzed as a per se taking, and it is. Because the tenant payment requirement harms BBLI's ability to use and lease its property, the appropriation of BBLI's money is treated as a per se physical taking, and that is the lesson of both the Supreme Court's decisions in Kuntz and Tyler. The tenant payment requirement at issue here interferes with BBLI's ability to use and lease the building, and under Kuntz, this is the link that triggers per se takings analysis for the monetary demand that BBLI is challenging. Once it is accepted, as it must be, that this money is constitutionally protected property that is subject to per se takings analysis, the analysis is, as the per se label indicates, very straightforward. There's no compensation, therefore this is unconstitutional, even if it's for a public use, and therefore the appropriate response is to reverse and remand the district court's opinion, and it can apply the appropriate remedy for this unconstitutional taking. Mr. Freeman, what are the limits of your argument? You're arguing that the money here is a taking because it limits the use of that money of what you can do or use it for with respect to the building, but it seems like if we agree that's a taking, that there are a whole lot of regulations out there about real property that have long been understood as okay that this would overturn. So in other words, it seems like we would be opening up all sorts of landlord-tenant regulations, regulations as to buildings and money, to constitutional challenges, which would be very, very different from where the Supreme Court has been. I understand your concern, Judge Sadie. I don't think that would happen for this reason. What are the limits? Why wouldn't that happen? In answering that, please, just tell us what legal principle limits your argument has. The limit is what I was trying to refer to earlier, that you do not get a per se physical take, an automatic takings analysis in a taking of money case unless the taking of the money also interferes with the use of real property. So you have a lot of monetary obligations that are out there. They're not going to be treated as per se takings. You might be able to bring regulatory takings. Why wouldn't property owners start coming in all the time saying, well, that regulation that requires me to pay X or limits my payment that I can receive on X is taking away extra money that I want to put back into the property? Right. And so user fees, taxes, those are not takings. That's money. So most of the things that you're perhaps, and I don't want to speak for you, but user fees, permit fees, all these type of things that we're used to, those are not takings. The Supreme Court has held that. That's not what we're dealing with here. We're dealing with a one of a kind, unique ordinance that requires the landlords to pay tenants who voluntarily choose to leave. Why wouldn't this apply then to all restrictions put on landlord tenants in terms of amounts that they can charge for rent, et cetera? Well, because it's not rent control. It's different. This is, again, if I could explain a little bit more what's happening here, this is a unique ordinance in which the tenants get to choose to take the money or leave. There are relocation fee ordinances that have been upheld, but those have applied when the landlord is ending a lease and evicting the tenant, and so the tenant gets paid moving costs because they have to move. That's not what's happening here. They don't have to move. They're being offered new leases. What's happening is they get the option to take a new lease from BBLI or its money. Give us a lease or give us your money, and so it's very unique, so I don't think the concern that these other things that have been generally upheld are going to be swept in into this circumstance where you have this unique sort of fee that's tenant choice. Would it be unconstitutional if they were required to use the $10,000 for another place to live or to pay rent? So if the statute specifically said this $10,000 that you get, you have to use that for your move, for your next rent, for a down payment, et cetera, would it still be unconstitutional? I think it would be a much closer case, particularly with public use and the regulatory taking analysis, but it wouldn't be. If the scenario was still the same, that you had to offer them the lease or they could choose to take your money, it would still be a taking of their money in that instance, but it may be for a public use. Mr. Bremer, I had a similar question, and that is, suppose you add on to Judge St. Eve's hypothetical a program control requirement, and what I mean by that is that the $10,000, $10,600 would be paid to a tenant, but it would be paid to a tenant through a direct reimbursement program where they had to come forward with a new lease agreement or a rider truck bill or something like that. And the reason I ask that question is there's a flavor in your brief, unless I've read it wrong, where one thing that seems to trouble your client is the lack of control. In other words, the $10,000 is given directly to a tenant that chooses to move, and there's no limitation on how that money could be used. It could be used for personal purposes. It could be blown at the casino. Anything could happen to the money. Have I read your brief correctly? So regardless of how they ultimately use it, and I think there should be controls because that goes to whether it's a public use and whether it's proportionality, regardless of how it's used, the landlords are not—it's not like a normal landlord or tenant restriction that Judge St. Eve was talking about. The reason you're pushing that argument is you're trying to distinguish the case from Ballinger. And you know Ballinger well. And Ballinger was a situation where the—I think it was the Ballingers, right? The military couple decided not to renew the lease when they came back from the military leave. And the argument out there in the Ninth Circuit was that, well, they're property owners. We'll give you time. Don't worry about the time. They're property owners. They have the right to do that. They're not evicting anybody. Just didn't win in the Ninth Circuit. So I think that's why you're here. Unless I'm hearing you wrong, that's why you're really emphasizing that the choice here is not made by the property owner. The choice is made by the tenant that chooses to move. I mean, that's part of it, but that's not the only reason. I think when you look at takings cases in general, it's generally a factual determination and ultimately it comes down to what fairness and justice requires in each case. And that particular fact that the need for this payment is not caused by the landlord is an important—regardless of Ballinger, it's an important fact about whether this qualifies—comes within the takings clause or it's just a regular landlord-tenant regulation in which regular landlord-tenant regulations, the need for the regulations are caused by what the landlord is doing. Here the landlord is not doing anything. They're just taking ownership. They step into the shoes of the owner. They're not evicting. They're offering new leases, and they're told, well, the tenants can break their lease and take your money. That's their choice. So the landlord is in a much different scenario than, say, the Ballingers or the Yees in the rent control cases because they are subject to the taking based on nothing except the city's will that it wants to give BBI's money to tenants to use whatever they want to use. Are you stepping away from your regulatory taking argument, or did you just choose to emphasize the per se taking when you approached? I'm not stepping away. I think it's the simplest— I want to ask you about that then. It's the investment-backed expectations portion of the Penn Central test. What are we to make of the fact that your client bought in 2024, and this is a 2021 regulation? So help us with that. Right, and that's an important question. And I saw your response in your brief. I think you're going to have to go beyond that because your client clearly bought a foreclosed building. Right, I will, and thank you for that question. First of all, just to clarify, notice doesn't apply to per se takings analysis, so we're just talking about regulatory takings analysis. And our position is that notice is irrelevant also in regulatory takings analysis and takings analysis in general because notice goes to what you expect, as you mentioned, and what the circumstances are. And that is not an appropriate criteria for whether property has been taken. Your expectations, what you thought, what the city thought, shouldn't matter. But let's say— You said should not matter? Shouldn't matter at all. But let's say I'm wrong. Let's say I'm wrong and you're under Penn Central, and expectations and notice is something you might want to think about. That's a factual issue that shouldn't be resolved on a motion to dismiss like it was here. So even if your owner is correct or you think that notice is important, it's one small slice of a bigger balancing test that's a factual inquiry that we haven't had a chance to develop any facts about what the BBLI knew or didn't know, what the city really intended or didn't intend. All those things should be resolved with some discovery so we can get to expectations and notice if, again, they actually matter. How much of the Penn Central test did you need to plead facts supporting in your complaint? I think you need to—as ye—there's a footnote in ye. I'm sorry, I forget the footnote. But the footnote in ye basically says that you just need to plead a takings claim, and the theory of that claim doesn't have to be within the complaint. And so there's plenty of facts in this complaint, but the facts of what people knew, how much they bought, how much they paid, all that kind of thing, that's not in there, but that's not needed to bring a claim that you've taken our money, our private property. Mr. Bremer, suppose that the case was not dismissed on a motion and it did go into discovery, hypothetically, okay? And suppose in the discovery that the evidence showed that 95% of payment recipients under the city's ordinance used the payments 100% for housing relocation purposes. How would that factor into an analysis as you would see it? Well, I would think that might particularly affect the regulatory takings analysis. Yeah, yeah. It's not—I know you're on the per se. On the regulatory— Okay. Yeah, right. Thanks for clarifying. That would affect the analysis for sure. That would affect—assuming you're applying 3 Pong, Penn Central, that would affect maybe the impact and the character of the government action. But we don't have that, and that's part of the problem here. So does that go to the—there's a little bit of a back and forth in the papers about whether this is facial or as applied. That's right. There is some of that, and it's both. It's facial and as applied. And that's not only what we allege, but it's also—there's elements of both facial and as applied arguments in this case. And the distinction is—it's not really super helpful in this case, and let me explain why real briefly. In a facial taking claim, you allege that the enactment itself takes property. Well, at the time of the enactment, we didn't own the property. So it became—it took our property. The existence of the ordinance took our property when we became subject to it, when we purchased, when we acquired a certain property. So it has elements of both facial and as applied, and I think that's why there's a little bit of confusion there. It's just not a tight fit there. You could look to Cedar Point, which was supposedly a facial claim, but the court just resolved it as a takings claim because it was a regulation like here that applied to a property. What about the fact that in your complaint, every count except for your due process counts, you say, in parentheses, facial? There is that in there, and that's part of— If you're the court, certainly if you're the district court judge, and you get that, and it says facial, how are we supposed to say, well, no, that's not just facial. It's as applied, and to put on top of that the broad remedy that you're seeking. Right, and I understand that point, but the district court did not resolve it as a facial claim, and I'd just like to point out for the record, Salerno, the whole, every application has never been applied to a takings claim. It doesn't apply to the takings clause. This court has never applied Salerno to a takings clause. The standard is in Keystone, Bituminous, Cole Association, the standard for a facial takings, if you were to conclude that this is only a facial takings, the standard is whether the enactment of the regulation itself takes private property, and so even if that is the standard in all our claims and all the argument is only facial, which I dispute, we would still—the analysis is still the same, and it would be something like this. The existence of this ordinance causes a per se physical taking of BBLI's property. It's not necessarily how the city is going to enforce it with each tenant, or it's this operates in every instance with BBLI's property to take its property without just compensation or public use. Okay, we used a lot of your time with questions, and I know you wanted to reserve two minutes, so how about we give you that, and in the meantime, let's hear from the city. Thank you. You're welcome. May it please the court. When tenant-occupied residential properties go through foreclosure, the impact on families and communities are very destabilizing. To help address this issue, the city passed the Keep Chicago Renting Ordinance, which regulates the landlord-tenant relationship in the foreclosure context by requiring new owners to do a lot of different things, including registering the property with the Commissioner of Housing, ascertaining identity to occupants, providing written notices, negotiating new rental agreements in good faith, and only in the contingency where new rental agreements are not reached, provide relocation assistance. Plaintiff claims that this portion of the law violates the takings clause, primarily calling it a physical per se takings, but under any approach, it's a valid regulation of the landlord-tenant relationship that does not violate the Constitution. Just a level set here on the physical per se taking claim, the Supreme Court has explicitly held that statutes regulating the economic relations of landlords and tenants are not per se takings absent the government's physical occupation of the residential property. BBLI attempts to create the appearance of a physical taking claim where none exists by ignoring that broad power and focusing on the mere transfer of money in the ordinance in isolation. But the Supreme Court has recognized that governments may require landlords as part of entering into this relationship to provide for things of value for their tenants' benefits. This could be utility connections, mailboxes, building-wide sprinkler systems, etc. Providing relocation assistance can just be easily added to the list of things. Now, plaintiff argues in their reply brief that some of these other things of value either serve different purposes or can be less expensive, but none of that matters for the physical per se takings analysis, where the hypothetical taking of something worth one penny is the same as something taking very expensive or valuable. What about the fact that there are no requirements on what they spend this money on? And how does that impact the public use piece? Well, the city's position is that that would only maybe go to the public use requirement, but that the public use requirement isn't relevant to this case, because either it is not a takings and then we don't have to get to public use, or it is a takings and we don't compensate, so it doesn't really matter whether there's a public use or not, like win or lose, there's still no compensation. So the public use analysis never comes into play into this case. Hold on. Slow down just a second and go over that one more time. So either the law is not a takings, as we contend. On the per se point. Yeah, or on any point, whether regulatory or per se. It's not a takings under whether it's Penn Central analysis or per se analysis, and then we don't get – it doesn't matter what the public use is, because it's not takings at the outset. We're not even operating in the takings clause. Or it is a takings, and then we're not compensating them. So even if we win the point that it's a public use, the law is still not valid. So there's no scenario where you get to – in this scenario, we get to a public use requirement. Public use requirement is where we take something, we provide compensation, and they say you still couldn't do that because it wasn't for a public use. Suppose, for example, that the district court did not rule in your favor on the motion to dismiss and the case proceeded to discovery. I think you would quickly agree you wouldn't have an interlocutory appeal. There's no finality. I can't imagine that there would have been a certified issue or anything like that. It would have proceeded to discovery. Okay. And suppose that the discovery showed that 95% of the recipients of payments under the ordinance said that they took the payment because they viewed it as an incentive to move. Alternatively, suppose that 95% of the recipients said they used the money for non-housing purposes, for other personal purposes. Okay. Is any of that relevant? Would any of that be relevant in summary judgment briefing on the plaintiff's claim? If so, how? If not, why not? No, it would not be in our opinion because it doesn't matter for the physical per se, which is looking at the nature of the taking itself. How about on the regulatory takings? On the regulatory, under the three pen central factor in the discussion, I don't see how that comes into play on any of those because we're looking at the economic impact on the landlord. We're looking at whether they had their investment back occupations. What they're concerned about is that they lost the money in this regulation, not what happens to the money after it's lost. Maybe that could come into play in a public use style analysis, but again, we're arguing that the public use doesn't actually, isn't dispositive for this. Is the dollar amount of the payment set under the ordinance relevant or irrelevant? It's relevant for the pen central analysis. It's not relevant for a per se takings analysis. So if we're looking at the economic in factor of the pen central regulatory, you can imagine a scenario where, and then it gets into very fact dependent things, which gets to the whole issue of facial versus as applied here, but let's say they bought a property for $10,000 and the regulation makes them spend millions of dollars on some relocation assistance. Maybe the economic impact factor would be at least in their favor in that situation. So it factors into the multifaceted pen central analysis, but it's not relevant for per se. Now to be sure money itself can be a form of property protected under takings laws, but only when there's a vested monetary interest that's taken, not just the mere general obligation to pay on the happening of a contingency, which is all we're dealing with here. I mean, if you look at the Supreme Court's decision in Eastern Enterprises, notwithstanding the split opinions, all nine justices agreed that the regulatory obligation to generally pay money was not a per se takings. Then they went on to dispute whether it was a regulatory takings under pen central. And then if you look at the Supreme Court cases since Eastern Enterprises, they've held that money is a per se takings only when a specific source or pot is kind of physically taken. For example, in Brown v. Legal Foundation of Washington, it was the interest earned on lawyer trust accounts that the government went in and took that money. What is the weakness in BBLI's argument that obviously when I am an investment owner, I buy a new property, I've got money that I want to use to either improve the property or take the property in a different direction, et cetera, et cetera. So if you're requiring me to pay $10,000 per tenant who chooses to leave, that was money set aside for a different source. What's the weakness there? Well, I still don't see how that plays into the per se physical taking claim, which is looking kind of like the nature of what the government is doing here. There was some discussion in the opening arguments about what would be the limiting principle here. I think that's important for this discussion because any regulation operating upon a property owner for owning property would be under their rationale, something that would be per se, not just potentially to owners under Penn Central, but per se a regulatory taking. That's completely untenable. I mean, if you think about requirements for landlords to make repairs or maintain habitability standards, that would be a required monetary expense that operated on their property interest. Or another example from our brief, car liability insurance mandates require the owner of cars to pay money to private insurance companies to register or operate their vehicle. That expense, under plaintiff's reasoning, would operate upon a property interest. These sort of regulations where simply money is required to be expended in certain situations have never been analyzed as per se takings. Again, regulations can theoretically go too far, be too onerous under the Penn Central analysis and become a takings, but that's an entirely separate inquiry from whether there's a physical per se takings of money. Plaintiff relies heavily on the Coons case for their per se takings analysis, which was an unconstitutional conditions case, not a per se takings case. And it held that the government cannot circumvent the limits on coercing a property owner to cede certain real property by offering them the alternative of forfeiting money. The Supreme Court explained that in such a context, the monetary payment was the functional equivalent of the prohibited exaction of physical property. But here there is no physical exaction for which the money is in lieu of. Instead of taking an equivalent in the interest of the real property itself, the city is merely regulating a landlord's obligations to its tenants when that relationship comes to an end. Simply put, the plaintiff's entire attempt to cast this as a per se takings claim is a misdirection. Instead, the ordinance is properly analyzed under Penn Central, which is economic impact, investment-backed expectations, the nature of the government action, each of which indicates that the relocation assistance is not a taking, or the economic impact factor. Why is that a factual question that should proceed to discovery, the Penn Central analysis? Well, I mean, this also gets into... No, it does not, because to the extent we are correct in all they have pled as a facial claim, they need to prove the law is not constitutional in any of its applications. So here, when they're talking about, well, if the tenant chooses to leave, being opposed to being forced off by the landlord, or if they don't use the money for certain factors, that's all maybe relevant for an as-applied challenge, but not relevant for a facial one. And then here, even if you give them the opportunity to plead an as-applied challenge on this, well, they haven't alleged any of these economic factors. So even based on the pleadings, they've still lost, because... Do they need to plead Penn Central, though? So I would say that... Is it Rule 8 and our requirements that you plead? I would say it's a little unclear whether they are required to legally plead. We are pleading a regulatory takings claim versus a per se takings claim. But there still needs to be enough facts in the complaint to support whatever type of theory it is that they're alleging. Obviously, those can be proved later during discovery, but regardless of the... whether it's unconstitutional claims, Luca-style, total regulatory claims, whatever the legal theory is for taking claims, there still needs to be facts in the complaint to support whatever that legal theory might be. And here, they have none of them. But what is the... How many facts do they need? They said, we bought it, we have these tenants, we negotiated in good faith. Some tenants didn't take the deal. They've left. And indeed, we see the lawsuit, the cross-action lawsuit by the tenants. So what additional fact... Oh, and they said, you know, this is going to be a lot of money for us. Well, yeah. So, I mean, I think we're... In talking about the Penn Central analysis, what else do they need to plead? I mean, what I would say is they need to plead almost like the denominator of the equation. You know, $10,000 of added expense on a billion-dollar investment doesn't really even, on the pleading, show that they've suffered a significant economic harm. But maybe $10,000 on a $10,000 investment would be enough to plead that there's been a significant economic harm. So they haven't showed that the amount of the relocation assistance that they are... We don't even know how many tenants they've paid out to. Based on the pleadings, like, there's, like, three or so examples. Well, if their building is worth a billion dollars, which we don't know because they didn't plead it, then so they've paid $30,000 on a billion-dollar investment, that's enough to even plead a significant economic impact. I wouldn't think so as an as-applied challenge. But again, we believe that they're primarily pleading a facial challenge, which, as opposing counsel recognized, is looking at the very enactment of the statute. So... In other words, you agree that the Supreme Court, anyway, has not applied Salerno to takings? I think it's a distinction without a difference, because what you're looking at in the very enactment is that apply to everybody that would be affected. The mere enactment that's so eviscerated, kind of that... so causes widespread economic harm that it doesn't matter the as-applied facts. It would be facially unconstitutional. So I think it's different wording to describe, essentially, the same underlying principle for a facial claim. But here, the ordinance's impact is highly variable. Based on property-specific circumstances, how many tenants are in the building, and therefore how many they potentially need to pay out, the total value of the building and their investment, how many tenants may or may not sign a new lease. Imagine a scenario where every tenant signed a new lease. Then there would be no money that they would have to pay under a facial takings analysis. So the economic impact of these payments in relative the underlying property are all case-specific, fact-dependent inquiries not presented here. The investment-backed expectation factor also runs squarely against their taking claim. As your Honor's noticed, they acquired this property years after its enactment. Therefore, they should have been on notice of possibly paying out these monetary relocation fees. And indeed, it's reasonable to assume that such a potential liability may get factored into the cost of acquiring such tenant-occupied buildings, maybe making them cheaper than they otherwise would have been. In the reply brief, they rely on the Palazzolo case to argue that this factor is inconsequential. But that is a complete misrepresentation of that case. In Palazzolo, the Supreme Court said that the acquisition after the effective date did not categorically bar a regulatory takings claim, and it remanded the case for actual consideration of the Penn Central factors. But we aren't arguing that their taking claim is categorically barred. We're just saying that the investment-backed expectation factor weighs against them on the merits. What's your reaction to Mr. Bremer's point that, yeah, I mean, Ballinger, there's a lot of similarities with Ballinger, but there is a pretty key difference there with respect to the choice that the Ballingers made to not renew the lease and to evict the tenant. We don't believe that distinction is dispositive in this case. Here, the relevant choice that's being made is by the incoming property owner voluntarily entering into the tenant-landlord relationship and therefore assuming the whole plethora of responsibilities that landlords have under current regulation. I think he would say to you, that's not the choice, though, that is triggering the taking, or at least the alleged taking. The choice that's triggering the taking is the choice that's made by the tenant. In other words, it's not made by... The fact that Edison bought the North Sheridan property doesn't, in and of itself, require payments to tenants. The payments to the tenants come when the tenants ask for or choose to receive the payments. I think that's his point. Right, and that may get into kind of the daylight between an as-applied and a facial challenge, because, again, there's many scenarios where maybe the landlord wouldn't even offer a reasonable lease terms and therefore essentially forcing the individuals out. So in that kind of scenario that could play out, the landlord is basically making the decision for the tenant in that scenario. So, again, you wouldn't get into kind of the all-of-its-applications type deal there. Again, even if you're looking at that choice, we don't believe that's as positive for it. I think that goes back to the per se takings claim, because we still don't see how that operates upon an identified property interest any more than any other sort of regulation that forces landlords to do certain things. Whether it's, you know, it could be providing things that are inexpensive, like smoke detectors, but, again, the monetary amount in a per se taking claim doesn't matter. It's well established that governments can force landlords to spend money for their tenants' benefit. I mean, imagine if this case was a law saying you have to provide moving trucks. So it's not a cash value, but it's just another response. Would that change the analysis? We don't think so. Either way, you're forcing a landlord to provide things of value for their tenants' benefit, which have not been held to be per se takings. Okay. Hearing no further questions, thank you very much. Appreciate it. Okay. Mr. Bremer. Thank you. I'll try and quickly address each particularly regulatory concern that Your Honors raised to opposing counsel. First, as far as what you need to plea, again, look at Yee v. City of Escondido. There's a footnote in there where the Supreme Court says, you just need to plead a takings claim, and the theory that you use can change while you're going through litigation. You don't have to explain your whole theory. Secondly, as far as Judge Scudder, your questions about what, if discovered, we would find out whether 95% are spending it for this or 95% are not spending it for this, that would flesh out the economic impact. That would flesh out what the cost is of this requirement for BBLI, because we would find out who's spending it, what they're spending on it. We would also know the cost. We would know more about the cost, and that would go to economic impact. We'd also learn about the expectations about the, as counsel brought up several times, about what are the expectations when they bought this property, if that matters. Again, the character of the government action, that would go to the character, whether this actually moves towards serving a public use as more of a private benefit or the public use is incidental. And if it's an incidental public benefit, then the character would also point towards a taking under the Penn Central analysis. So it's important that it is a factual, holistic sort of determination that does generally require some discovery. And I think, as Your Honor mentioned, we have pled enough for that. We've pled $2 million loss. From this, you can see from the class action that it could go more than that, but we've pled a severe economic impact, and we've pled the character of the action. There's no public use. There's no, it's like a physical invasion because they're appropriate. Do you agree on the public use? Do you agree with Mr. Merrill that we don't even need to get to that element if we find no taking up front? If there's no taking, then there's no, then you don't get the public use. But I would say the flip side of that is, if there is a regulatory takings question here, or per se, that needs to go down, then the public use claim needs to go down with it because that would be tied to that. And I'd also, as a question to Judge Scudder about, the public use comes before compensation, both in the text of the Tate's Clause and in general. If there's no public use, no amount of compensation doesn't even matter. So if the taking is tied to the public use, they go together, and then we would have discovery to figure that out. The class action, is it on pause until this appeal is resolved, even though it's a separate case, or not? It is on pause right now. Nothing's happening to that. I think there's a discussion of mediation coming up, but it's not an active litigation at this time. A motion to dismiss was denied. That's about it. But is the pause related to the pendency of this appeal? I don't think there's a formal order along those lines. No, Your Honor. Okay. Mr. Bremer, thank you very much to your colleague as well, and to the city. We very much appreciate the advocacy this morning. We'll take the appeal under advisement. Thank you, Your Honor.